**UNITED STATES of America,**
**Appellee,**

v.

**Jerome SUGGS, aka Vincent Darden,**
**Defendant–Appellant.**

No. 00–1637.

United States Court of Appeals,
Second Circuit.

July 5, 2001.

Paul F. Thomas, Assistant Federal Public Defender, New Haven, CT; Thomas G. Dennis, Federal Public Defender, on the brief, for appellant.

Anthony E. Kaplan, Assistant United States Attorney, New Haven, CT; Stephen C. Robinson, United States Attorney, District of Connecticut on the brief, for appellee.

Present JACOBS, PARKER, and SOTOMAYOR, Circuit Judges.

*SUMMARY ORDER*

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the district court be AFFIRMED.

Jerome Suggs appeals from the judgment of the United States District Court for the District of Connecticut (Arterton, J.) convicting him, following a jury trial, of robbery in interference with interstate commerce (18 U.S.C. § 1951; "Hobbs Act") and use of a firearm in a crime of violence (18 U.S.C. § 924(c)(1)). In a severed proceeding, Suggs also pled guilty to unlawful possession of a firearm (18 U.S.C. § 924(g)(1) & (e)(1)).

On appeal, Suggs makes three claims: i) the district court erred in denying his motion to suppress a gun seized from him during a *Terry* frisk at a bar; ii) the jury instruction setting out the standard for "interference with interstate commerce" was erroneous; and iii) there was insufficient evidence that any money was stolen during the robbery or that the robbery interfered with interstate commerce.

Suggs robbed a convenience store, and left before the police arrived. The police closed the store for several hours to investigate the crime scene. The police recovered several bullet fragments and shell casings, and determined that a drawer containing the proceeds from lottery ticket sales was missing. The manager told police that the missing drawer likely contained $30–$40.

Two days later, the patron of a local bar told the bar's owner that another patron had a gun. The owner, Mr. Livingston, watched the man reputed to be armed and observed that he was acting strangely ("hyper"), but saw no weapon. Livingston approached two off-duty police officers working outside the bar. The officers knew Livingston, having furnished security services to him for several years, had previously acted on his tips, and considered him reliable. Livingston told the two officers that there was a man inside with a gun whom Livingston could identify. According to the testimony of the two officers, Livingston did not tell them that his information was second-hand. (Livingston's testimony is equivocal on this point .) Livingston led the officers to Suggs. After a short exchange, one of the officers pat-frisked Suggs, detected a weapon, and a scuffle ensued. The officers recovered a Glock 9mm handgun.

Suggs's fingerprints were matched to prints obtained from inside the cashier's window and a police ballistics expert matched the seized handgun to the bullets used during the store robbery.

Suggs was subsequently tried and convicted of robbery in interference with interstate commerce and use of a firearm in a crime of violence; he also pled guilty to unlawful possession of a firearm.

\* \* \*

■ i) The district court concluded that the police officers who searched Suggs had suspicion sufficient to support a *Terry* frisk. Both officers testified that they did not know that Livingston learned of the gun from a third-party. Livingston testified first that he did not remember whether he told the officers that his tip was second-hand; later, he said he thought he told them that "a lady told me." The district court's resolution of this conflicting testimony was not clearly erroneous. *See, e.g., United States v. Fields,* 113 F.3d 313, 319 (2d Cir.1997) ("When reviewing rulings on motions to suppress, we examine the evidence before the district court in the light most favorable to the government, and will disturb factual findings only when they are clearly erroneous."). The officers were presented with an informant known by them to be reliable, and offering a fresh observation of criminal activity. A *Terry* search under such a circumstance is supported by *Adams v. Williams,* 407 U.S. 143, 144, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (involving "illegal possession of a handgun found during a 'stop and frisk' ").

■ ii) Judge Arterton instructed the jury that "if you decide that there was actual or potential effect in any way or degree at all on interstate commerce, then that is enough to satisfy [the requirement that the robbery interfered with interstate commerce]. The interference may be very slight, even a potential subtle or minimal effect on commerce will suffice." To the extent that the instruction permitted conviction on the basis of *potential* effect on interstate commerce, Suggs contends that it was inconsistent with the relevant statutory language. *See* 18 U.S.C. § 1951(a). We disagree. *See, e.g., United States v. Shareef,* 190 F.3d 71, 75 (2d Cir.1999) ("[The defendant's] contention that only an actual, not a potential, effect on commerce

can suffice to sustain a substantive Hobbs Act charge is squarely contradicted by our precedents."); *United States v. Angelilli,* 660 F.2d 23, 35 (2d Cir.1981) ("Even a potential or subtle effect on commerce will suffice.").

■ iii) Suggs argues that the government presented insufficient evidence to demonstrate that Suggs stole any money during the robbery or that the robbery had any effect (potential or otherwise) on interstate commerce.

> When a defendant challenges the sufficiency of the evidence underlying his conviction, we review the evidence in the light most favorable to the government, drawing all possible inferences in favor of the prosecution. . . . The ultimate question is not whether we believe the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could so find.

*United States v. Payton,* 159 F.3d 49, 55–56 (2d Cir.1998) (citations and emphasis omitted).

The evidence adduced at trial supported the inference that the drawer containing proceeds from lottery ticket sales, which was missing, had contained $30–$40. As the district court found, this was sufficient to "lay a foundation from which the jury could draw a logical conclusion that currency was stolen. . . . "

■ As to the robbery's effect on interstate commerce, the evidence showed: that the store was closed for three to four hours while the robbery was investigated; that the store lost several hundred dollars in sales during that closure; that the store sold numerous products manufactured outside the state; and that a random sampling of vehicles frequenting the store included a significant number of cars with out-of-state license plates. This evidence

is sufficient to demonstrate that the robbery had an actual or potential effect on interstate commerce.

For the reasons set forth above, the judgment of the district court is hereby AFFIRMED.